**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

TECHMAN SALES, INC.

                              Plaintiff                    Case No. 09-11172-GER-VMN
                                                           Hon. Gerald E. Rosen

v.

MAGNUM 2000, INC.

                              Defendant
_____/

**OPINION AND ORDER REGARDING**
**CROSS-MOTIONS FOR SUMMARY JUDGMENT**

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _____January 4, 2011_____

PRESENT:  Honorable Gerald E. Rosen
                 Chief Judge, United States District Court

## I.  INTRODUCTION

Plaintiff/Counter-Defendant Techman Sales, Inc. (Techman) brought this diversity

suit on June 23, 2009, asserting a breach of contract claim arising from the failure of

Defendant/Counter-Plaintiff Magnum 2000, Inc. (Magnum) to pay commissions allegedly

owed to Techman for certain orders and accounts and from the failure of Magnum to

maintain Techman as Magnum's exclusive sales representative for all house accounts.

Magnum filed a counterclaim on January 27, 2010, alleging that Techman breached its

fiduciary duty to Magnum by entering a sales agreement with another company and

allegedly intentionally driving down Magnum's sales in an effort to purchase Magnum at

a low price.  Magnum claims that this alleged action by Techman constitutes a breach of contract, warranting rescission of the contract and damages.

Each party has moved for summary judgment on both the complaint and counterclaim.[1]  These motions focus on three different issues.  First, the parties dispute which version of the contract governs the present action.  Techman argues that the November 18, 2002 Sales Agency Agreement is the final binding contract between the parties.  Magnum argues that this agreement was replaced by later oral agreements, which limited Techman's commissions.  Second, the parties dispute the meaning of the term "exclusive representative", which appears in the various written contracts.  Third, the parties dispute whether or not Techman should be considered a fiduciary of Magnum, and if so, whether a breach of fiduciary duty qualifies as a material breach of contract.

All three motions have been fully briefed by the parties.  Having reviewed the parties' briefs and supporting exhibits, as well as the remainder of the record, the Court finds that the pertinent allegations and legal arguments are sufficiently addressed in these materials, and that oral argument would not assist in the resolution of these motions.  Accordingly, the Court will decide the motions "on the briefs."  *See* Local Rule 7.1(f)(2), U.S. District Court, Eastern District of Michigan.  The Court's opinion and order is set forth below.

---

[1]  Techman submitted a single motion seeking summary judgment on both the complaint and counterclaim, whereas Magnum addressed the complaint and counterclaim separately by submitting two motions for partial summary judgment.

2

## II.  FACTUAL BACKGROUND

**A.      The Parties**

Techman is a sales representative agency with offices in Ohio and Michigan.  It has nineteen employees, approximately ten of which are engineers.  Michael R. Spence is Techman's president and one of two shareholders.  From 1998 to the present action, Techman served as Magnum's independent sales representative.

Magnum is a screw machine manufacturer with its sole office and production facility in Ontario, Canada.  It is owned by Joseph and Mary Skupnik.  Magnum hired Techman in 1998 to promote the sale of and sell its products and services.  The parties entered into a written sales agreement on November 18, 2002.[2]

**B.      The Terms of the Agreement**

Under the 2002 Sales Agency Agreement ("2002 Agreement") Magnum "appoint[ed] Techman as its exclusive representative to promote the sale of and sell its products and services . . . in the territory . . . and Techman accept[ed] the appointment and agree[d] to sell and promote the sales of Magnum's products and services."  (Pl.'s Mot. for Summ. J. Ex. 4 ¶ 1.)  The exclusive territory was defined as "[t]he Continental United States, Mexico, and Canada . . . except: Mark IV Air Intake Systems (Montreal) [and] Krupp Fabco."  (*Id.* at ¶ 2.)  Techman could also serve as the exclusive representative for

---

[2]  The parties had originally entered into their first sales agreement in 1998, which was later amended in 2000.  The previous version and amendment of the sales agreement is not relevant to the present action, because it is undisputed that the 2002 Agreement superceded any previous agreements.

customers outside this territory "by requesting, in writing, and receiving permission, in

writing, from Magnum." (*Id.*)  The clause governing Techman's compensation provided:

> A commission of 5% shall be paid for orders originated and shipped within
> Techman's exclusive territory and for those accounts outside the territory
> and incorporated herein by [paragraph] #2.  Techman shall be the
> representative for Magnum for all house accounts (Appendix A)
> commencing October 15, 2002, and shall be paid a commission of 2% for
> orders originated and shipped within the exclusive territory of Techman.
> As soon as the monthly sales of Magnum for two (2) consecutive months
> reach $1,700,000.00 (Canadian funds), the commission to Techman shall be
> increased to 5%.

(*Id.* at ¶ 4.)  The section regarding sales provided:

> All sales shall be at prices and terms established by Magnum and it shall
> have the right, in its discretion, from time to time, to establish, change, alter,
> or amend prices and other terms and conditions of sale.  Techman shall not
> accept orders in the name of Magnum or make price quotations or delivery
> promises without the prior consent and approval of Magnum.

(*Id.* at ¶ 6.)  The section regarding the effective date and termination provided:

> This Agreement shall be effective on the date of signature and shall
> continue in force for a three (3) year period, and shall be automatically
> renewed for additional three (3) year periods, thereafter, unless terminated
> by written notice from either party to the other.  The agreement may be
> terminated for any additional three (3) year period by either party with or
> without cause, provided that written notice to cancel the extended term be
> given to the other party by certified mail return receipt requested at least
> 180 days before the extended term is scheduled to begin.

(*Id.* at ¶ 8.)  The section covering rights upon termination of the contract provided:

> Upon termination, Techman shall be entitled to all ongoing commissions,
> both present and future, from sales made within the exclusive territory by
> Techman or at any customer Techman was authorized to represent Magnum
> for as long those products or services are ongoing (i.e. life of part/life of
> product).

4

(*Id.* at ¶ 9.)  The 2002 Agreement also included an integration clause:

> This Agreement contains the entire understanding of the parties, supercedes
> any other oral or written agreements, and shall be binding upon and insure
> [sic] the rights and benefits of both parties, its successors and assigns.  It
> may not be modified in any way without the written consent of both parties.

(*Id.* at ¶ 11.)  Finally, the last section of the 2002 Agreement contains a choice of law

provision, stating that "[t]his agreement shall be construed according to the laws of the

State of Ohio."  (*Id.* at ¶ 12.)

## C.    Actions after the 2002 Agreement

Magnum claims that the 2002 Agreement was replaced by oral "gentlemen's

agreements" around the end of 2003.  This alleged oral contract increased Techman's

commission to five percent on all accounts within the exclusive territory including house

accounts.  Techman created a new written agreement based on this oral discussion, but

the written agreement was never signed by the parties.  (Pl.'s Mot. for Summ. J. Ex. 7.)

According to Magnum, Techman did begin receiving increased commissions in 2004, but

the increase in commission was conditioned upon Techman working harder to increase

sales on the house accounts, which Techman began managing in 2002.  Magnum further

claims another superceding oral agreement was made in 2004, returning all house

customers to Magnum.  In January 2005, Magnum stopped paying Techman commissions

on house accounts.

On March 10, 2005, Techman entered a sales agreement with Advance Precision,

another screw machine manufacturer located in Toronto, Canada.  Techman contends the

agreement and work with Advance Precision was not prohibited by the 2002 Agreement and was completed with Magnum's consent and to benefit Magnum.  Magnum contends, however, that Advance Precision is a direct competitor of Magnum, and Techman entered the agreement with Advance Precision secretly, in bad faith, and in breach of Techman's fiduciary duty to Magnum.

On June 15, 2005, Techman wrote a letter to Magnum seeking enforcement of the sales agency agreement[3], including payment of commissions on house accounts and utilization of Techman as Magnum's exclusive sales representative, both of which Magnum had ceased in January 2005.  Magnum's president, Joseph Skupnik, did not respond to this letter, because he claims to have been battling cancer at the time and also felt the letter from Techman contained false information.  Magnum also claims Techman waited until June 2005 to send the letter in order for the window for terminating the automatic three-year extension of the 2002 Agreement to expire.  Magnum does, however, openly acknowledge that it made independent sales and actively sought new business without using Techman as its sales representative, after it perceived a lack of effort from Techman to do so.

Annual sales for Magnum allegedly exceeded twelve million in 2002.  Magnum's sales revenue in Canada alone allegedly declined from $8.3 million in 2002, to $6.1

---

[3]  It is unclear from the letter whether Techman is seeking enforcement of the signed 2002 Agreement or the unsigned revised agreement from 2003.  The 2002 Agreement provides for 2% commission on house accounts, whereas the unsigned agreement from 2003 provides for a 5% commission on house accounts.

million in 2005, to $5.1 million in 2006, and ultimately to a low of $633,000.[4]  Magnum

claims the decline in sales was due to Techman's poor management and lack of effort.

Techman contends, however, that it invested nearly $750,000 in staff resources to support

Magnum's sales, and the decline is due to Magnum's lack of quality control,

unwillingness to diversify products, and inability to stay cost-competitive.

Techman filed suit on June 23, 2009.  During the course of discovery, Magnum

found a handwritten note on a copy of a letter within Techman's records that states

"[m]aster plan- [decrease] sales, buy M2K cheap."  (Pl.'s Mot. for Summ. J. Ex. 20.)

Magnum interpreted the note to mean Techman intended to devalue Magnum and

purchase Magnum at a low price.  The note and Techman's representation of Advance

Precision formed the basis for Magnum's counterclaim filed on January 27, 2010.

Techman responded by claiming the note was written by one of its employees to capture

accusations made by Magnum's President, Joseph Skupnik, during a phone call between

the parties.

### III.  ANALYSIS

**A.    Standards Governing the Parties' Motions**

Through their present cross-motions, the parties seek summary judgment in their

favor on Techman's claim for commissions allegedly owed to it under the terms of the

2002 Agreement with Magnum.  In addition, the each party seeks summary judgment in

---

[4]  The briefs do not state the year in which the Canadian sales revenues totaled $633,000.

7

its favor on Magnum's counterclaim for rescission and damages pursuant to Techman's alleged breach of fiduciary duty and contract.

Under the pertinent Federal Rule, summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).[5] As the Supreme Court has explained, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party. *Pack v. Damon Corp.*, 434 F.3d 810, 813 (6th Cir. 2006). Yet, the nonmoving party "may not rely merely on allegations or denials in its own pleading," but "must-by affidavits or as otherwise provided in [Rule 56]—set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). Moreover, any supporting or opposing affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on

---

[5] On December 1, 2010 a new version of Fed. R. Civ. P. 56 took effect. Due to the parties' submission of summary judgment motions prior to the effective date, the Court's opinion and order is decided under and cites the old rule.

8

the matters stated." Fed. R. Civ. P. 56(e)(1).  Finally, "the mere existence of a scintilla of

evidence that supports the nonmoving party's claims is insufficient to defeat summary

judgment." *Pack,* 434 F.3d at 814 (alteration, internal quotation marks and citation

omitted).  In addition, a party seeking summary judgment on issues as to which he bears

the burden of proof, must make a showing "sufficient for the court to hold that no

reasonable trier of fact could find other than for the moving party." *Calderone v. United

States*, 799 F.2d 254, 259 (6th Cir. 1986) (emphasis omitted).

**B.      Applicable State Law**

        When sitting in diversity, federal courts must apply the conflict of law rules of the

forum state.  *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85

L.Ed. 1477 (1941).  Here, Techman filed in Michigan federal court, and Michigan's

choice of law rules "require a court to balance the expectations of the parties to a contract

with the interests of the states involved to determine which state's law to apply." *In re

Dow Corning Corp.*, 419 F.3d 543, 548 (6th Cir. 2002).  The Michigan Supreme Court

follows the approach of the Restatement (Second) of Conflict of Laws, §§ 187-188,

which provides that choice of law provisions will be enforced, unless there is no

substantial connection between the contract and the chosen state or enforcement would

violate a fundamental policy of the state, which would have governed in the absence of

the parties' selection.  *Kipin Indus., Inc. v. Van Deilin Int'l, Inc.*, 182 F.3d 490, 493 (6th

Cir. 1999).  Here, there is a substantial connection between the contract and Ohio,

because Ohio is one of two states in which Techman maintains offices, and the state of

9

Ohio is part of the exclusive territory granted to Techman in the 2002 Agreement. Therefore, the Court will enforce the choice of law provision in the 2002 Agreement and use Ohio law in determining all issues related to interpretation of the contract and for Magnum's breach of contract claim.[6]

Although pursuant to the parties' choice of law provision the Court must interpret the 2002 Agreement under Ohio law to determine whether the contract created a fiduciary relationship, a claim for breach of fiduciary duty itself is a tort claim distinct from a breach of contract claim. *See Centra, Inc. V. Estrin*, 538 F.3d 402, 411 (6th Cir. 2008). Traditionally, Michigan courts have adhered to the rule of *lex loci delicti*, meaning the locus of injury determines which state law to apply for tort claims. *Sutherland v. Kennington Truck Serv., Ltd.*, 454 Mich. 274, 278, 562 N.W.2d 466, 468 (1997). More recently, Michigan courts have adopted a rule in which Michigan law will be applied for tort claims brought in Michigan courts unless a "rational reason" to apply another state's law exists. *Id.* at 286, 562 N.W.2d at 471; *Brandt v. Starwood Hotels and Resorts Worldwide, Inc.*, 02-10285, 2004 WL 2958661, at *3-4 (E.D. Mich. Dec. 14, 2004).

Here, Magnum presents arguments to generally support its fiduciary duty claim under both Michigan and Ohio law, but it does not specifically address which state's law

---

[6] In its counterclaim, Magnum labels its counts as "Breach of Contract and Fiduciary [sic] Seeking Rescission" and "Breach of Contract and Fiduciary Duty Seeking Damages." (Def.'s Countercl. 6-7.) Magnum does not, however, clearly articulate a separate claim for breach of contract in its briefs, but rather seems to allege Techman breached the parties' contract by breaching its fiduciary duty. Because a breach of contract claim and a breach of fiduciary duty claim are independent causes of action, the Court will address the two separately.

10

the Court should apply.  Techman correctly argues that Michigan law should apply to the

fiduciary duty claim, because Michigan is the forum state and Magnum allegedly lost

sales and was thus injured in Michigan.  Having found merit in Techman's, the Court will

analyze the breach of fiduciary duty claim under Michigan law.[7]

## C.     Effect of Oral Agreements Subsequent to 2002 Written Agreement

Techman bases its breach of contract claim on the language and terms of the 2002

Agreement and an alleged 2003 oral agreement, which increased commissions on house

accounts from two percent to five percent.  Techman claims the only change ever made to

the 2002 Agreement was the 2003 oral agreement to increase the commission rate on

house accounts, and there was no agreement that the increased commission was

conditioned on Techman increasing sales.

Under Ohio law, "no-oral-modification" integration clauses, like the one in the

2002 contract, are generally not given full effect.  *Fraher Transit, Inc. C. Aldi, Inc.*, No.

24133, 2009 WL 187937, at *3 (Ohio App. Jan. 28, 2009).  Such clauses are deemed

waived by oral agreements when there is clear and convincing evidence that alterations

were made with knowledge and participation of both parties.  *Id.*  Here, Magnum admits

making the 2003 oral agreement to raise Techman's commissions on house accounts to

five percent, and the fact that Magnum began making the increased payments in 2004

---

[7] Even if there is a rational reason to apply Ohio law to the breach of fiduciary duty claim due to the parties contractual relationship, the Court would come to the same conclusion, as explained in footnote nine of this opinion and order.

shows that it fully participated in this alteration. The Court does not find, however, that the increase in commissions was conditioned upon Techman improving sales performance. Although, Techman does not dispute that the increase in commissions was intended to provide incentive for Techman to perform better, the Court finds that receiving an incentive does not mean Techman guaranteed an increase in sales. It is also particularly important to note that the 2003 oral agreement was a simple *modification* and not a replacement of the written 2002 Agreement. The record does not show that the 2003 oral agreement made any changes to the various provisions of the 2002 Agreement other than an increase in Techman's commissions on house accounts.

Additionally, Magnum argues that another oral agreement was made at the end of 2004, which returned all house accounts to Magnum and limited Techman's commissions to sales made with Techman's direct involvement. To defeat Techman's motion for summary judgment on this issue, Magnum must provide some factual basis that supports the claim that the alleged 2004 oral agreement was made with knowledge and participation by both parties. The Court finds that Magnum has failed to provide any such factual support. The only statements regarding sending all house accounts back to Magnum and restricting Techman's commissions come from Joe Skupnik and Gregory Hyslop, both employees of Magnum. (Def. Resp. to Pl. Mot. for Summ. J. 16-17.) Magnum provides no statements from Techman's employees, which would show Techman agreed to send all house accounts back to Magnum and restrict commissions to only sales with which it was directly involved. In fact, the June 15, 2005, letter from

12

Techman shows that Techman had no intent of agreeing with the changes in the alleged 2004 oral agreement.

The Court concludes that Magnum has failed to provide any factual support from which a jury could conclude that clear and convincing evidence exists for a mutual oral modification in 2004. Therefore, the Court finds that the present claims are governed by the written 2002 Agreement as modified by the increased commission sales percentage for Techman in the 2003 oral agreement.

**D.    The 2002 Agreement Established an Exclusive Agency**

Magnum argues that the 2002 Agreement was an exclusive sales agency contract, which did not grant Techman an exclusive right to sell. An exclusive agency contract grants a sales agent the right to sell and obtain commissions to the exclusion of all other agents, while the principal retains its right to make its own sales with no obligation to pay the agent a commission. *Dohner v. Bailey*, 20 Ohio App.3d 181, 183, 485 N.E.2d 727, 730 (1984). An exclusive right to sell grants the agent a right to commission payment on all sales, even if the principal itself makes the sale. *Id.* Magnum correctly states that under Ohio law, an exclusive right to sell only exists if specific language in the contract grants such a right, and any ambiguity should be construed against the party that drafted the contract. *DiSalle Real Estate Company v. Howell*, 117 Ohio App.3d 113, 117, 690 N.E.2d 25, 28 (1996). Here, the court finds no specific language in the 2002 Agreement stating Magnum is liable to pay Techman sales commissions for sales Magnum made itself, and additionally, Techman drafted the contract. For these reasons, the Court

13

concludes that the 2002 Agreement formed an exclusive agency, and Magnum does not owe Techman any commissions for sales made directly by Magnum.  Therefore, Techman's breach of contract claim based on Magnum making sales without Techman's involvement fails as a matter of law, and summary judgment is properly entered in favor of Magnum on this issue.

It is important to note, however, that specific language in the contract does exist regarding sales commissions on house accounts.  The 2002 Agreement assigned "all house accounts" to Techman as Magnum's representative commencing October 15, 2002. Magnum's argument that this statement simply expanded Techman's exclusive territory to include all of Canada is nonsensical.  If the parties intended to further expand Techman's territory, they should have done so by altering the plain language under the "territory" section of the contract as they had done on two previous occasions.  The Court concludes that the modification regarding house accounts made under the "compensation" section of the 2002 Agreement granted Techman commission rights to sales from house accounts at a two percent rate beginning October 15, 2002, and at a five percent rate as of the oral agreement at the end of 2003.[8]

_____

[8]  Both parties agree in their supplemental briefs that the attachment referred to as "Appendix A" in the 2002 Agreement contains an erroneous phrase which states "Techman Sales, Inc., shall *not* call on the following Magnum 2000, Inc. customers located in Canada on behalf of Magnum 2000, Inc." (emphasis added).  This Appendix A was the same sheet used in previous versions of the contract between the parties, and the parties failed to edit it for the 2002 Agreement.

14

Taking the Court's analysis of exclusive agency contracts and the contract language regarding assignment of all house accounts into consideration, the Court concludes that Magnum owes Techman sales commissions for any sales made within Techman's exclusive territory, as defined in the 2002 Agreement, including all house accounts. The only exceptions, which do not require Magnum to pay Techman sales commissions, are sales made directly and exclusively by Magnum. If Magnum initially procured a customer, but later transferred to Techman the responsibility to manage continued sales to that same customer, then Magnum must pay sales commissions beginning on the date of transfer. All commissions are due to Techman for the life of the product per section nine of the 2002 Agreement.

**E.   Magnum's Waiver Defense**

Techman requests the Court to grant summary judgment in its favor for Magnum's waiver defense. As Techman correctly cites, "waiver is a voluntary and intentional abandonment of a known right." *Quality Products and Concepts Co. v. Nagel Precision, Inc.*, 469 Mich. 362, 374, 666 N.W.2d 251, 258 (2003). Magnum has failed to address this issue in its response. Because Magnum has failed to provide any factual support that Techman ever waived its right to commissions, summary judgment is properly granted in favor of Techman on Magnum's waiver defense. Fed. R. Civ. P. 56(c)(1).

**F.   Magnum's Counterclaims**

Although Magnum blends the claims for breach of fiduciary duty and breach of contract as a single count in its complaint, the Court analyzes each separately.

15

### 1.  Breach of fiduciary duty claim fails as a matter of law

Under Michigan law, tort claims brought by one contractual party against another, require the Court to apply the "separate and distinct" analysis. *Fultz v. Union Commerce Assoc.*, 470 Mich. 460, 467, 683 N.W.2d 587, 592 (2004).  "Specifically, the threshold question is whether the defendant owed a duty to the plaintiff that is separate and distinct from the defendant's contractual obligations.  If no independent duty exists, no tort action based on the contract will lie." *Id.*  Although, the *Fultz* case applied the "separate and distinct" analysis to a negligence claim, the same analysis applies to a breach of fiduciary duty tort claim.  *Engel Mgmnt., Inc. V. Ford Motor Credit Co.*, No. 279868, 2009 WL 348828, at *5 (Mich. App. Feb. 12, 2009).  Here, because Magnum has failed to provide any evidence that Techman owed it a duty independent of the parties' contractual obligations, it may only bring a single claim for breach of contract, and Magnum's breach of fiduciary duty claim is properly dismissed.[9]  *Id.*  Therefore, the Court need not address Magnum's requests for rescission or damages for breach of fiduciary duty.

### 2.  Breach of Contract

---

[9]  Similarly, under Ohio law, when "the causes of action in tort and in contract are factually intertwined, a plaintiff must show that the tort claims derive from the breach of duties that are independent of the contract and that would exist by force of law notwithstanding the formation of the contract."  *Wexler v. Jewish Hosp. Ass'n of Cincinatti*, No. A-8106063, 1983 WL 5281, *9 (Ohio. App. Oct. 26, 1983); *Accord Battista v. Lebanon Trotting Assoc.*, 538 F.2d 111, 117 (6th Cir.1976).

16

Finding no independent tort claim for breach of fiduciary duty, the Court addresses whether Techman has failed to meet any of its contractual obligations. Techman correctly states that Magnum has failed to cite any specific provision of the 2002 Agreement when arguing its breach of contract claim. Magnum instead argues that the contract and parties' relationship based on the contract prohibited Techman from engaging in certain behavior. Having reviewed the record as a whole, the Court finds the potential factual bases for this prohibited behavior include Techman's representation of Advance Precision and Techman's hand-written note, which allegedly represented a plan to drive down Magnum's sales and buy Magnum at a low price.[10]

### a. Sales to Advanced Precision

Although there is no provision in the 2002 Agreement or 2003 oral agreement prohibiting Techman from representing Magnum's competitors, Magnum alleges that Techman, serving as a fiduciary of Magnum, breached the parties' contract by entering a sales agreement with Advanced Precision. In order to succeed on this claim and obtain its requested relief in the form of rescission of the parties' contract and damages, Magnum must first establish that a fiduciary relationship existed between the parties. The Court finds the parties' contractual relationship did not mature into one of a fiduciary nature.

---

[10] Magnum's counterclaim also lists Techman's attempt to hire Magnum's employees and Techman's repeated lies as additional bases for a breach of contract claim. Magnum fails, however, to provide any factual support in its briefs explaining how such actions constitute a breach of contract.

17

Under Ohio law, a fiduciary relationship exists when "the agent has the power to bind the principal by his actions, and the principal has the right to control the actions of the agent." *Funk v. Hancock*, 26 Ohio App.3d 107, 110, 498 N.E.2d 490, 493-94 (1985). Courts should presume that the intent of the parties is reflected by the terms of the contract, and "if the contract is clear and unambiguous, then we must follow the contract's expressed terms and must not go beyond the plain language of the contract." *Langfan v. Carlton Gardens Co.*, 183 Ohio App.3d 260, 916 N.E.2d 1079, 1085 (2009).

Here, neither the express language of the 2002 Agreement, the 2003 oral agreement, nor the course of dealings over the years indicates the parties ever intended to create a fiduciary relationship.  In fact, as Techman correctly argues, section six of the 2002 Agreement specifically expresses Techman's inability to bind Magnum and Magnum's inability to exercise control over Techman.  Therefore, the Court concludes that the contract between the parties did not create a fiduciary relationship, and all of Magnum's breach of contract claims based on a breach of Techman's fiduciary responsibilities fail as a matter of law.

### b.  Breach of the duty of fidelity, good faith, and loyalty

Both in its counterclaim and throughout its briefs, Magnum continuously muddles the language and support regarding a breach of fiduciary duty versus a breach of contract. In its reply brief [Dkt. #81], Magnum requests the Court to grant summary judgment on its claim for "breach of the duty of fidelity, good faith, and loyalty."  The Court is not

18

aware of the existence of any cause of action using these exact words.  Magnum may

simply be expounding on elements of its breach of fiduciary duty claim or confusing its

claim with one for a breach of contract based on the covenant of good faith and fair

dealing.  Having dismissed Magnum's fiduciary duty claim and finding no prohibition for

Techman to serve as Advance Precision's sales agent, the Court now focuses solely on

the impact of Techman's hand-written note on a breach of contract claim based on the

covenant of good faith and fair dealing.

Although Magnum does not specifically articulate a breach of contract claim based

on Techman's note, Ohio courts have recognized that every contract contains an implied

covenant of good faith and fair dealing between the parties.  *Littlejohn v. Parrish*, 163

Ohio App.3d 456, 839 N.E.2d 49 (2005).  Here, the nature of the parties' relationship as

an exclusive agency, prevented Magnum from obtaining an alternate sales agent

anywhere within Techman's vast exclusive territory.  Therefore, if Techman did

intentionally decrease sales within its exclusive territory, it would be particularly

devastating to Magnum.  The Court finds that such action done for the purposes of buying

out Magnum at a low cost would certainly qualify as a breach of the covenant of good

faith and fair dealing.

As Magnum admits in its motion, Techman's explanation that the note simply

captures Magnum's false accusations is sufficient to raise an issue of fact, precluding

entry of summary judgment on this issue in Magnum's favor.  In order to defeat

19

*Techman's* motion for summary judgment on this issue, Magnum must similarly raise an issue of fact regarding Techman's alleged master plan to decrease sales and purchase Magnum.  Because Magnum has the burden of proof on this counterclaim, once Techman has shown the absence of evidence on a material fact, the burden then shifts to Magnum to provide some probative evidence to support its claim.  *Lansing Dairy, Inc. V. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)).

Here, Techman's explanation of the note is well-supported by testimony from Scott Wessner, one of Techman's sales representatives.  Wessner testified during his deposition that he wrote the note on a copy of the October 4, 2005 letter from Techman's president, Michael Spence, to Magnum's president, Joseph Skupnik.  (Wessner Dep. at 77-78, 136-37, 187.)  Wessner testified that he had a phone conversation with Skupnik on October 5, 2005, during which Skupnik voiced his protest to several points in Spence's letter.  (*Id.*)  Wessner further testified that the note regarding the alleged master plan was one of multiple notes he wrote on a copy of Spence's letter to capture Skupnik's remarks during the phone call.  (*Id.*)

20

The copies of the October 4, 2005 letter submitted with the parties' briefs does in fact contain other notes in red ink in addition to the master plan note. Techman's explanation of the note is factually well-supported by the timing of the phone conversation between Wessman and Skupnik, which immediately followed Skupnik's receipt of Spence's letter, and the presence of other notes on the letter, reflecting an attempt to document all of Skupnik's remarks during the conversation.[11] The Court finds this evidence is sufficient to shift the burden to Magnum to provide some probative evidence supporting its claim that the note reflects Techman's bad faith intent to decrease sales for Magnum. Because Magnum has failed to respond to Techman's explanation of the note and provides no other evidence to support this claim, summary judgment is appropriately entered in Techman's favor on the claim of breach of contract based on the covenant of good faith and fair dealing.

## IV.  CONCLUSION

For all of the reasons set forth in this opinion and order, and the Court being otherwise fully advised in the premises,

---

[11]  Techman also submitted an e-mail from Wessner to Spence, which further supports Techman's argument regarding the master plan note. The Court does not, however, consider the e-mail in its analysis, due to the likelihood that the e-mail itself and/or statements made within the e-mail would be inadmissible hearsay at trial. Fed. R. Civ. P. 56(e) (facts supporting or opposing a motion for summary judgment must be admissible in evidence).

IT IS HEREBY ORDERED that Plaintiff/Counter-Defendant Techman's April 30, 2010 motion for summary judgment [Dkt. #57] is GRANTED IN PART and DENIED IN PART, in accordance with the rulings in this opinion and order.

IT IS FURTHER ORDERED that Defendant/Counter-Plaintiff Magnum's April 30, 2010 motion for partial summary judgment on Techman's first amended complaint [Dkt. #64] is GRANTED as to the establishment of an exclusive agency, and is otherwise DENIED.

IT IS FURTHER ORDERED that Defendant/Counter-Plaintiff Magnum's April 30, 2010 motion for partial summary judgment on its counterclaim [Dkt. #58] is DENIED in its entirety.

IT IS FURTHER ORDERED that damages pursuant to this order will be determined at future proceedings.

s/Gerald E. Rosen_____

Dated: January 4, 2011                    Chief Judge, United States District Court

22

I hereby certify that a copy of the foregoing document was served upon counsel of record on January 4, 2011, by electronic and/or ordinary mail.

s/Ruth A.Gunther

Case Manager

(313) 234-5137